## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------ x
MALCOLM O. ASHLEY,              :
                               :
          Plaintiff,           :
                               :
          v.                   :
                               :
CITY OF BRIDGEPORT; LT. RONALD  :   Civil No. 3:17-cv-724(AWT)
MERCADO; OFFICER RODERICK DODA; :
OFFICER MARIE CETTI; and ST.    :
VINCENT'S MEDICAL CENTER,       :
                               :
          Defendants.          :
------------------------------ x
```

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

The plaintiff, Malcolm O. Ashley ("Ashley"), brings this action against the City of Bridgeport, Ronald Mercado, Roderick Doda, Marie Cetti, and St. Vincent's Medical Center seeking damages for injuries arising out of an incident that took place in April 2015. Defendants City of Bridgeport (the "City"), Lieutenant Ronald Mercado ("Mercado"), Officer Roderick Doda ("Doda"), and Officer Marie Cetti ("Cetti") (collectively, "the Municipal Defendants") move for summary judgment on Counts One, Two, Three, and Four of the Amended Complaint. Defendant St. Vincent's Medical Center ("St. Vincent's") moves for summary judgment on Counts Five and Six.[1]

---

[1] Count Seven of the Amended Complaint was previously dismissed by the court. See ECF No. 217.

For the reasons set forth below, the motions for summary judgment are being granted.

## I.    FACTUAL BACKGROUND

The following is an overview of the factual background. Additional details are discussed in connection with that defendant and the issues to which they are most relevant.

On April 4, 2015, the plaintiff was parked at a gas station in Bridgeport, Connecticut. A Georgia resident, the plaintiff was in Bridgeport to meet with city officials about a development initiative. While the plaintiff was standing outside his vehicle at the gas station, Officer Cetti and Officer Vicens were dispatched to the gas station in separate vehicles and upon arrival, the officers questioned the plaintiff about why he had been at the gas station for so long without purchasing any gas. The plaintiff told the officers that he had a back injury and was experiencing some pain, so he had stopped to stretch his back. The plaintiff was not found to be in violation of any motor vehicle laws. Cetti performed a patdown of the plaintiff and found a knife belonging to the plaintiff. The Municipal Defendants contend that Cetti "put Ashley's knife into the backseat of his car." Municipal Defendants' Local Rule 56(a)1 Statement ("Municipal Defs.' L.R. 56(a)1"), ECF No. 270-2, ¶ 27. The plaintiff states that Cetti "failed to return the Gerber combat knife." Pl.'s Local Rule 56(a)2 Statement in Opposition

to Defendant City of Bridgeport's Motion for Summary Judgment ("Pl.'s L.R. 56(a)2 for Municipal Defs."), ECF No. 286, at 11, 29. In an interview with the City of Bridgeport Department of Police, Office of Internal Affairs, the plaintiff stated that "the male officer [Vicens] took my knife," Municipal Defs.' L.R. 56(a)1, Ex. B City of Bridgeport Office of Internal Affairs File ("OIAFILE"), ECF No. 268, 000058 at line 43, but in the Amended Complaint, the plaintiff alleges that Cetti searched him and took the knife. See Am. Compl., ECF No. 186-1, Count One ¶¶ 29-30. The officers did not issue the plaintiff a citation, but instead told him to leave the gas station.

After this encounter, the plaintiff got into his vehicle and left the gas station. The officers then left the gas station in their respective vehicles. Vicens passed the plaintiff's vehicle and, subsequently, Vicens, Cetti, and the plaintiff were driving in close proximity to each other on State Street, with Vicens' vehicle directly in front of the plaintiff's vehicle and Cetti's vehicle directly behind the plaintiff's vehicle. While they were on State Street, Vicens stopped his vehicle and activated his emergency lights. The plaintiff stopped behind him. Cetti also activated her emergency lights and stopped her vehicle behind the plaintiff's. Cetti did not exit her vehicle. Vicens exited his vehicle and spoke to the plaintiff, who did not exit his vehicle and was not issued a citation.

Afterwards, the plaintiff drove to Bridgeport Police Headquarters. Upon arriving at Police Headquarters, the plaintiff entered and went to the front desk, with the intention of filing a "citizen's complaint." He spoke to Officer Killian first. Two additional officers, Lt. Mercado and Officer Doda, came out to speak with the plaintiff. While Mercado was speaking with the plaintiff, Doda requested the assistance of medics. Medics arrived at Police Headquarters, and the plaintiff was transported on a gurney into an ambulance. He was then transported to St. Vincent's Medical Center. Doda rode in the ambulance with the plaintiff. Doda completed a State of Connecticut Department of Mental Health and Addiction Services Police Emergency Examination Request ("PEER Request").

The ambulance arrived at St. Vincent's, and the plaintiff expressed that he did not want to be there. In due course, a member of the St. Vincent's medical staff gave the plaintiff an injection of a sedative. The plaintiff was admitted to St. Vincent's that evening and was discharged the following day, April 5, 2015.

## II. LEGAL STANDARD

"A motion for summary judgment may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter

of law." Rogoz v. City of Hartford, 796 F.3d 236, 245 (2d Cir.
2015) (quoting Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d
Cir. 2010)) (citing Fed. R. Civ. P. 56(a)). "The function of the
district court in considering the motion for summary judgment is
not to resolve disputed questions of fact but only to determine
whether, as to any material issue, a genuine factual dispute
exists." Id. (quoting Kaytor, 609 F.3d at 545) (citing Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)).

When ruling on a motion for summary judgment, the court
must respect the province of the jury. "In reviewing the
evidence and the inferences that may reasonably be drawn, the
court 'may not make credibility determinations or weigh the
evidence . . . . Credibility determinations, the weighing of the
evidence, and the drawing of legitimate inferences from the
facts are jury functions, not those of a judge.'" Kaytor, 609
F.3d at 545 (quoting Reeves v. Sanderson Plumbing Prods., Inc.,
530 U.S. 133, 150 (2000)). "Where an issue as to a material fact
cannot be resolved without observation of the demeanor of
witnesses in order to evaluate their credibility, summary
judgment is not appropriate." Id. at 546 (quoting Fed. R. Civ.
P. 56(e) advisory committee's note (1963)).

When reviewing the evidence on a motion for summary
judgment, "'the court must draw all reasonable inferences in
favor of the nonmoving party,' Reeves, 530 U.S. at 150, 'even

though contrary inferences might reasonably be drawn,' Jasco Tools Inc. v. Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009)." Kaytor, 609 F.3d at 545. "Summary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit, for the court in considering such a motion 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" Id. (quoting Jasco Tools, 574 F.3d at 151-52).

Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (internal quotation marks omitted) (quoting W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]." Liberty Lobby, 477 U.S. at 252.

Also, the nonmoving party cannot simply rest on the allegations in his pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine

issue of material fact exists. See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," id., if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial," Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quotation marks, citations and emphasis omitted). "Accordingly, unsupported allegations do not create a material issue of fact."  Weinstock, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. A material fact is one that would "affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. As the Court observed in Liberty Lobby: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are

irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. See Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986))). Immaterial or minor factual disputes will not prevent summary judgment.

Because the plaintiff in this case is proceeding pro se, the court must read the plaintiff's pleadings and other documents liberally and construe them in a manner most favorable to the plaintiff.  See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).  Moreover, because the process of summary judgment is "not obvious to a layman," Vital v. Interfaith Medical Ctr., 168 F.3d 615, 620 (2d Cir. 1999), the district court must ensure that a pro se plaintiff understands the nature, consequences and obligations of summary judgment, see id. at 620-21. Thus, the district court may itself notify the pro se plaintiff as to the nature of summary judgment; the court may find that the opposing

party's memoranda in support of summary judgment provide
adequate notice; or the court may determine, based on thorough
review of the record, that the pro se plaintiff understands the
nature, consequences, and obligations of summary judgment. See
id.

After reviewing the defendants' memoranda in support of
summary judgment and the plaintiff's submissions in opposition,
the court concludes that the plaintiff understands the nature,
consequences and obligations of summary judgement.  First, the
defendants served the plaintiff with the notice to pro se
litigants required by Local Rule 56(b). See Notice by City of
Bridgeport, Marie Cetti, Roderick Doda, Ronald Mercado, ECF No.
274; Notice by St. Vincent's Medical Center, ECF No. 277.
Second, the plaintiff submitted oppositions and surreplies to
the defendants' motions, which contain argument in opposition to
the defendants' contentions and include exhibits. This indicates
that he understands summary judgment. The court finds that the
pro se plaintiff in this case understands the nature,
consequences and obligations of summary judgment.

**III. DISCUSSION**

**A.   Count One – Officer Cetti**

In Count One the plaintiff claims that Cetti violated his
rights under the Fourth Amendment of the Constitution and
Article First, Section 7 of the Connecticut Constitution by

illegally searching, seizing, and falsely arresting him by confining his person without probable cause or reasonable suspicion, seizing and taking his property, ordering him to leave a place of public accommodation and to leave the city and state, restraining and interfering with his freedom, stopping his vehicle without probable cause, and confining him. See Am. Compl., Count One ¶ 29. The Municipal Defendants have moved for summary judgment on the 42 U.S.C. § 1983 claims on the grounds that Cetti did not stop, seize, or arrest the plaintiff and, in the alternative, that Cetti's actions were reasonable under the circumstances. See Defendants' City of Bridgeport, Lt. Ronald Mercado, Officer Roderick Doda and Officer Marie Cetti's Motion for Summary Judgment ("Municipal Defs.' Mot. for Summ. J."), ECF No. 270-1, at 8.

"In order to state a cause of action under 42 U.S.C. § 1983, a plaintiff must allege that some person acting under color of state law deprived him of a federal right." Ahlers v. Rabinowitz, 684 F.3d 53, 60-61 (2d Cir. 2012) (citing Washington v. James, 782 F.2d 1134, 1138 (2d Cir. 1986)). The plaintiff's claims against the police officer defendants relate to their actions in the course of their employment by the Bridgeport Police Department. So the police officer defendants were acting under the color of state law.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend IV. "The Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995).

"[T]here are three levels of interaction between agents of the government and private citizens. Consensual encounters require no justification so long as the police do not convey a message that compliance with their requests is required. Investigative detentions, the second category, require 'reasonable suspicion' to believe that criminal activity has occurred or is about to occur. Arrests, requiring a showing of probable cause, comprise the third type of encounter between citizens and government agents." United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995)(internal citations and quotations omitted). Two distinct encounters between the plaintiff and Cetti require analysis under the Fourth Amendment: first at the gas station, and second on State Street.

### 1.   Gas Station

The encounter between the plaintiff and Cetti at the gas station was not consensual. Cetti repeatedly tried to get the plaintiff's attention, ultimately making physical contact, until

the plaintiff responded. Cetti did not ask the plaintiff for permission to perform a patdown. The Municipal Defendants state that the plaintiff did not want to give Cetti his identification. Thus, the encounter is analyzed using the Terry v. Ohio, 392 U.S. 1 (1968), framework of an investigatory detention.

"[Terry stops], no matter how brief, must be founded upon a reasonable suspicion supported by articulable facts that criminal activity may be afoot." Tehrani, 49 F.3d at 58. "When evaluating the reasonableness of a Terry stop, the reviewing court must consider the totality of the circumstances surrounding the stop. And the court must evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000) (internal quotations omitted). "[R]eviewing courts . . . must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002).

Based on the totality of the circumstances, Cetti had a particularized and objective basis for suspecting legal wrongdoing. Cetti had responded to a report that an individual was "parked at the gas pumps for over an hour, refusing to move

-12-

. . . , acting erratic." Municipal Defs.' L.R. 56(a)1, Ex. B, OIAFILE 000040. Once Cetti arrived, the plaintiff was initially unresponsive, and the plaintiff appeared disoriented. Cetti learned from speaking with the gas station attendant that the plaintiff had refused to leave even though he had been at the gas station for over an hour and that the plaintiff had not purchased any gas. Also, the plaintiff offered no explanation, beyond stretching his back, for why he had been there for so long or why he was in that particular area, and he had out-of-state license plates.

The plaintiff asserts that "The absence of any sworn witness statements that the plaintiff was engaged in any illegal activity, and his mere presence did not constitute any illegal activity that warranted a search of his person or parked vehicle or confiscation of personal property." Pl.'s L.R. 56(a)2 for Municipal Defs. at 17, 22. But the plaintiff points to no evidence that creates a genuine issue of material fact with respect to whether Cetti's actions in approaching the plaintiff and asking him questions was objectively reasonable in light of the circumstances.

In the course of a lawful Terry stop, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." Berkemer v. McCarty, 468

U.S. 420, 439 (1984). Thus, when Cetti asked the plaintiff for his identification during the course of a lawful Terry stop, she did not violate his Fourth Amendment rights.

The plaintiff also claims that Cetti conducted an unconstitutional search of his person. "A limited search for weapons, without a warrant and without probable cause, is also permissible in connection with a lawful custodial interrogation that does not rise to the level of an arrest, see, e.g., Terry v. Ohio, 392 U.S. 1, 21 (1968), on the rationale that '[i]f a suspect is 'dangerous,' he is no less dangerous simply because he is not arrested,' Michigan v. Long, 463 U.S. 1032, 1050 (1983). Further, the suspect need not actually be dangerous to validate such a limited-purpose search, so long as the officer has a reasonable belief that the suspect poses a danger and may have a weapon within his reach." McCardle v. Haddad, 131 F.3d 43, 48 (2d Cir. 1997). "Where an officer makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." United States v. Muhammad, 463 F.3d 115, 123-24 (2d Cir. 2006)(citing Terry, 392 U.S. at 30).

In evaluating the reasonableness of an officer's actions, "the proper inquiry is not whether each fact that led the officer to conduct the stop considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing." United States v. Lee, 916 F.2d 814, 820 (2d Cir. 1990). "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." Illinois v. Wardlow, 528 US 119, 125 (2000). Reasonable suspicion for a frisk may be based on an officer's personal observations in addition to information supplied by another person prior to the officer's opportunity for personal observation. See Adams v. Williams, 407 U.S. 143, 146-47 (1972)("[W]e reject respondent's argument that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person."); see also United States v. Schiavo, 29 F.3d 6, 8 (1st Cir. 1994)("The propriety of an officer's actions after an initial stop depends on what the officer knows (or has reason to believe) and how events unfold. The touchstone is reasonableness." (internal citations omitted)).

Based on the totality of the circumstances, including Cetti's knowledge prior to arriving at the scene, what she learned from the gas station attendant, and her observations at the scene, Cetti's patdown of the plaintiff was based on

reasonable suspicion that the plaintiff may have posed a danger and have had a weapon. The 911 caller in this case was known to be the manager of the Getty Gas Station. (It is unclear from the record whether this person and the gas station attendant are the same person.) The caller reported that a man was "parked at the gas pumps for over an hour, refusing to move . . . , acting erratic." Municipal Defs.' L.R. 56(a)1, Ex. B, OIAFILE 000040. The call was entered into the Bridgeport Police Incident Summary as "suspicious circumstances-prowler/person" and assigned to Cetti. Id. ¶ 12; id., Ex. B, OIAFILE 000040. Cetti's observations upon arriving at the gas station corroborated the description provided by the caller. Cetti spoke to the gas station attendant for corroboration and to investigate the situation. Then, when Cetti interacted with the plaintiff, he was initially unresponsive and appeared disoriented. Also, the plaintiff offered no explanation, other than that he was stretching his back, for why he had been at the gas station pump for so long.

Having recovered a Gerber combat knife in the course of lawfully patting down the plaintiff, Cetti acted reasonably in removing it from his person because one of the purposes of a patdown is to "neutralize the threat of physical harm." Terry, 392 U.S. at 24.

The plaintiff also "alleges that the search of his vehicle by Officer Cetti was without reasonable cause." Pl.'s L.R. 56(a)2 for Municipal Defs. at 17. Here the plaintiff relies solely on allegations in the "Complaint." Id. at 11. "[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." Michigan v. Long, 463 U.S. 1032, 1049 (1983). Cetti stated that she did not conduct any search of the plaintiff's vehicle, but Vicens states that she did. However, Vicens' recounting of the events shows that Cetti did no more than conduct a limited search that was permissible under Michigan v. Long. The plaintiff has not produced evidence to create a genuine issue as to whether Cetti did more than that.

Again relying solely on the "Complaint," the plaintiff states that "[t]he officers then told Ashley to get on the road and head to Georgia." Pl.'s L.R. 56(a)2 for Municipal Defs. at 11. Thus, the plaintiff also appears to claim that Cetti unlawfully ordered him to leave. "Police officers frequently order persons to leave public areas: crime scenes, accident

sites, dangerous construction venues, anticipated flood or fire paths, parade routes, areas of public disorder, etc. A person may feel obliged to obey such an order. Indeed, police may take a person by the elbow or employ comparable guiding force short of actual restraint to ensure obedience with a departure order. Our precedent does not view such police conduct, without more, as a seizure under the Fourth Amendment as long as the person is otherwise free to go where he wishes." Salmon v. Blesser, 802 F.3d 249, 253 (2d Cir. 2015).

The undisputed facts show that Cetti verbally ordered the plaintiff to leave the gas station. The Municipal Defendants maintain that "Cetti advised Ashley that he was free to go and should leave because he was blocking other customers from getting gas and had no reason for being there." Municipal Defs.' L.R. 56(a)1 ¶ 31; id., Ex. B, OIAFILE 000100 at lines 80-84, OIAFILE 000112 at lines 58-59; see id., Ex. A, Ashley Depo., ECF No. 270-3, at 44:3. There is no indication that the plaintiff was not otherwise free to go where he wished. Thus, Cetti's order to the plaintiff to leave did not amount to a seizure under the Fourth Amendment. See Salmon, 802 F.3d at 253.

### 2.  State Street

The plaintiff claims that he was unlawfully seized while he was driving on State Street after he left the gas station. See Pl.'s L.R. 56(a)2 for Municipal Defs. at 11-12. "Temporary

detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'. . . . An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Wren v. United States, 517 U.S. 806, 809-10 (1996) (internal citations omitted). "[A]n officer's use of his cruiser lights also may constitute a seizure in the sense that no reasonable driver would think that he was free to leave." United States v. Lopez, 432 F. Supp. 3d 99, 110 (D. Conn. 2020)(internal quotations omitted); see also, United States v. Hernandez, 63 F. App'x 6, 9 (2d Cir. 2003) ("When the overhead lights went on, the car was 'seized'—in the sense that no reasonable driver would think that he was free to leave, see United States v. Mendenhall, 446 U.S. 544, 554 (1980).")

Cetti activated the overhead lights of her vehicle. See Pl.'s L.R. 56(a)2 for Municipal Defs. at 12; Municipal Defs.' L.R. 56(a)1 ¶ 40; id., Ex. A, Ashley Depo. at 49:23-24, 52:24. In his interview statement, Vicens reported that as the plaintiff left the gas station, Vicens left and then Cetti left behind Vicens. Vicens stated that he must have passed the plaintiff on Park Street before Vicens took a left going east on

State Street. Vicens reported that, "I was going down State Street when I saw in my rearview mirror that he got really close behind me, almost like - like he was going to hit me. So at the same time, Officer (Cetti) was calling me telling, 'This guy almost hit you.' She must have noticed, she was behind him." Municipal Defs.' L.R. 56(a)1, Ex. B, OIAFILE 000112 at lines 65-68. The plaintiff offers no evidence to dispute Cetti's observations. Thus, there is no genuine issue as to the fact that Cetti had probable cause to believe that a traffic violation had occurred and properly participated in a traffic stop.

Therefore, the motion for summary judgment is being granted as to the constitutional claims under 42 U.S.C. § 1983 in Count One.

### B.   Count Three – Officer Mercado and Officer Doda

In Count Three, the plaintiff alleges that defendants Mercado and Doda "searched, seized and falsely arrested, the plaintiff by executing a false PEER report as there was no reasonable basis to believe that the plaintiff had psychiatric disabilities, was dangerous to himself or gravely disabled. The plaintiff's insistence on peacefully reporting police misconduct by means of a citizen's complaint motivated the execution of the PPER." Am. Compl. ¶¶ 47-48. The plaintiff brings claims pursuant to 42 U.S.C. § 1983 for violation of his rights under the Fourth

Amendment and the First Amendment, as well as state law
constitutional claims.

        1.   **Fourth Amendment**

An involuntary hospitalization constitutes a seizure. See
Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993)("Other courts
have construed the Fourth Amendment's protections to apply to
involuntary hospitalizations. . . . We agree.") "[A]n
involuntary hospitalization may be made only upon probable
cause, that is, only if there are reasonable grounds for
believing that the person seized is subject to seizure under the
governing legal standard." Id. Conn. Gen. Stat. § 17a-503(a)
provides:

> Any police officer who has reasonable cause to believe that
> a person has psychiatric disabilities and is dangerous to
> himself or herself or others or gravely disabled, and in
> need of immediate care and treatment, may take such person
> into custody and take or cause such person to be taken to a
> general hospital for emergency examination. The officer
> shall execute a written request for emergency examination
> detailing the circumstances under which the person was
> taken into custody, and such request shall be left with the
> facility. The person shall be examined within twenty-four
> hours and shall not be held for more than seventy-two hours
> unless committed under section 17a-502.

The Municipal Defendants assert that "Ashley voluntarily
got onto the gurney" and that "Ashley was never given an
ultimatum to go to the hospital or be arrested." Municipal
Defs.' L.R. 56(a)1 ¶¶ 83-84; id., Ex. D, ECF No. 268, AMR Report
("AMR"), 000002. The video shows the plaintiff getting onto the

gurney with no assistance. There is no sign of the "shoving, pushing lifting, and then slamming the plaintiff with sufficient force, to compel his egress onto an ambulance gurney . . . ." that the plaintiff alleges. Pl.'s L.R. 56(a)2 for Municipal Defs. at 13, 18-19.

However, viewing the evidence in the light most favorable to the plaintiff, including the fact that Doda completed a PEER Request, the court assumes for purposes of this motion that the plaintiff was involuntarily transported to St. Vincent's.

Nonetheless, there is no genuine issue as to the fact that Mercado and Doda had reasonable cause to believe that the plaintiff had psychiatric disabilities and was dangerous to himself or others or gravely disabled, and in need of immediate care and treatment. The plaintiff testified that Mercado told him: "Well, we're concerned about you. We think something is mentally wrong with you." Municipal Defs.' L.R. 56(a)1, Ex. A, Ashley Depo. at 78:13-15. "Mercado observed that Ashley's responses to him were 'very slow,' that his pupils were dilated and glassy, and that he would respond to certain questions by staring back at him for awhile and/or refusing to answer the questions." Id. ¶ 74; id., Ex. B, OIAFILE 000149 at lines 79-81, OIAFILE 000151 at lines 139-42. Mercado thought the plaintiff "either had a mental issue or was under the influence of narcotics." Id., Ex. B, OIAFILE 000149 at lines 61-62. Mercado

"smell[ed] the alcohol on [the plaintiff's] breath." Id., Ex. B, OIAFILE 000151 at line 165. Doda believed that the plaintiff "might have either [been] drinking or having some kind of medication in his system because his pupils were . . . sort of small." Id., Ex. B, OIAFILE 000139 at lines 76-78. Both officers observed that the plaintiff "was confused as to what day it was." Id. ¶ 65. The PEER Request that Doda completed stated that the plaintiff was "disoriented, not knowing what day it is, irritable, uncooperative, agitated, obsessive, had mood swings, was anxious and exhibited assaultive thoughts/behavior, was aggressive in response to officers' questions and had possibly abused a substance and/or possibly used pain medication." Id., Ex. B, PEER Request, OIAFILE 000036.

The plaintiff fails to offer evidence that could support a conclusion that the officers did not have reasonable grounds for executing a PEER Request and causing the plaintiff to be transported to a hospital. He merely argues that "Defendant Doda filed a falsified PEER . . . alleging as a central observation, 'he detected the presence of alcohol emanating from the body of the plaintiff,' but Doda failed to state any observed psychiatric dysfunction of the plaintiff during the event of 4 April 2015 at Bridgeport Police Headquarters." Pl.'s L.R. 56(a)2 for Municipal Defs. at 5. But the detection of alcohol was only one of several observations that supported the officers'

conclusion that the plaintiff needed immediate medical attention, and the plaintiff's allegation that the report was falsified is unsupported by any evidence.

### 2. First Amendment

The plaintiff alleges that his First Amendment rights were violated by the officers "deliberately deterring and chilling speech critical of police conduct." Am. Compl. ¶ 49. "A private individual who asserts a First Amendment violation must show: (1) he has a right protected by the First Amendment; (2) the defendants' actions were motivated or substantially caused by plaintiff's exercise of that right; and (3) the defendants' actions caused him some injury." Dingwell v. Cossette, 327 F. Supp. 3d 462, 469 (2d Cir. 1998)(internal quotations and brackets omitted).

There is no genuine issue as to the fact that the actions of Doda and Mercado were not motivated or substantially caused by the plaintiff's exercise of his First Amendment rights because the officers were unaware of the plaintiff's interaction with Cetti and his intention to file a complaint against police officers. When Mercado was interviewed as part of the internal affairs investigation, he recounted that the plaintiff "at times . . . was upset," that he was "reluctant to answer questions," and that "Ashley never mentioned his interaction with officers at the Getty Station to Schneider or Mercado or the fact that

his knife was taken." Municipal Defs.' L.R. 56(a)1, Ex. B,
OIAFILE 000150 at lines 111-124. When asked during his interview
about the plaintiff's "initial complaint," Doda recounted,

> It was no complaint actually. There was no complaint except
> the fact that, uh, he came in as he addressed, uh, partly
> just to Officer (Killian) that he wants to see chief of
> police now. There was no complaint whatsoever. He was just,
> uh, he was demanding in seeing the chief. And then he said
> that, uh, he wants to see, uh – uh, crew come from TV.
> Something like this.

Id., Ex. B, OIAFILE 000140 at lines 116-120. The plaintiff's
only testimony on this subject during his deposition was that ".
. . once Doda started speaking to me I said: Are you the
commander? All I want is to file a complaint because I need get
out of here, I need to get on the road." Id., Ex. A, Ashley
Depo. at 72:5-9.

Therefore, the motion for summary judgment is being granted
as to the constitutional claims in Count Three brought pursuant
to 42 U.S.C. § 1983.

### C.   State Law Claims Against Municipal Defendants

As suggested by the Municipal Defendants, the court
declines to exercise supplemental jurisdiction over the
plaintiff's state law claims against the Municipal Defendants
for violations of Article First, Section 7 (Counts One and
Three), Article First, Section 4 and 14 (Count Three),
Conversion (Count Two), and Intentional Infliction of Emotional
Distress (Count Four). See Municipal Defs.' Mot. for Summ. J. at

-25-

29. Pursuant to 28 U.S.C. § 1367(c)(3), the court may decline supplemental jurisdiction over state law claims when the federal claims initially supporting such jurisdiction have been dismissed. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003). The plaintiff's state law claims against the Municipal Defendants are derivative of his constitutional claims against the Municipal Defendants, and summary judgment is being granted as to those claims.

> **D.   Count Five and Count Six – St. Vincent's**

In Count Five of the Amended Complaint, the plaintiff alleges that St. Vincent's "caused plaintiff to suffer apprehension of an imminent and harmful and offensive physical contact." Am. Compl., Count Five ¶ 57. In Count Six of the Amended Complaint, the plaintiff alleges that St. Vincent's "physically contacted the plaintiff in a harmful and/or offensive manner; and/or purposefully caused the plaintiff to suffer harmful and/or offensive physical contact." Id. at Count Six ¶ 57. The plaintiff asserts that "under the care of defendant St. Vincent's, and without his consent, plaintiff was

sedated by chemical injection with other invasive procedures performed." Local Rule 56(a)2 Statement in Opposition to Defendant St. Vincent's Motion for Summary Judgment ("Pl.'s L.R. 56(a)2 for St. Vincent's"), ECF No. 287, at 2. The plaintiff contends that, "Instead of having a qualified physician, employee or agent assess the plaintiff and perform a meaningful, independent medical evaluation and without reliable verification of statements in the PEER, St. Vincent's Hospital, agents and or employees suddenly and without consent assaulted the plaintiff, injecting him with 10 milligrams of Haldol and 2 milligrams, sedating him by means of a chemical restraint." Am. Compl., Facts ¶ 50.

"A civil assault is the intentional causing of imminent apprehension of harmful or offensive contact in another." Griffin v. O'Connell, CV135034557S, 2015 Conn. Super. LEXIS 286, at *32-33 (Conn. Super. Ct. Feb. 6, 2015) (quoting 1 Restatement (Second of Torts) § 21 (Am. Law Inst.)); see also Dewitt v. John Hancock Mut. Life Ins. Co., 5 Conn. App. 590, 594 (1985). "An act is done with the intention of putting the other in apprehension of an immediate harmful or offensive contact if it is done for the purpose of causing such an apprehension or with knowledge that, to a substantial certainty, such apprehension will result." 1 Restatement (Second of Torts) § 21, cmt. d. "A battery is a completed assault." Hanson v. Hosp. of Saint

Raphael, No. CV030480365, 2007 WL 2317825, at *1 (Conn. Super. July 20, 2007). "The theory of battery as a basis for recovery against a physician has generally been limited to situations where he fails to obtain any consent to the particular treatment or performs a different procedure from the one for which consent has been given, or where he realizes that the patient does not understand what the operation entails." Logan v. Greenwich Hosp. Ass'n, 191 Conn. 282, 289 (1983).

While lack of informed consent may constitute the basis for assault or battery in certain scenarios, Connecticut courts recognize the emergency exception to the doctrine of informed consent. See Wood v. Rutherford, 187 Conn. App. 61, 92 (2019)("The emergency exception has been recognized by courts across the country. . . . Although our appellate courts have not had occasion to circumscribe the precise parameters of the emergency exception, it applies under our state regulations to medical treatment performed in hospitals throughout Connecticut."); Ranciato v. Schwarts, No. NNHCV116023107S, 2014 WL 7497403, at *2 (Conn. Super. Ct. Nov. 26, 2014)("[I]n the absence of an emergency a healthcare provider must offer pertinent information to his or her patients."); Conn. Agencies Regs. § 19-13-D3(d)(8)("It shall be the responsibility of each hospital to assure that the bylaws or rules and regulations of medical staff include the requirement that, except in emergency

situations, the responsible physician shall obtain proper informed consent as a prerequisite to any procedure or treatment for which it is appropriate . . . .")

"Application of the doctrine of informed consent, . . . involves more than simply an examination of the communications, or lack thereof, between physician and patient. It also requires consideration of the context in which the physician's duty arose. That context is crucial to the determination of whether an exception to that duty is implicated." Wood, 187 Conn. App. at 95. Conn. Gen. Stat. § 17a-503(a) permits police officers to "take or cause such person to be taken to a general hospital for emergency examination under this section."

Because an analysis of the factual circumstances is central to an application of the emergency exception and because "[s]everal of the exceptions that are well established in other jurisdictions have not been formally recognized under Connecticut law[, their] . . . . development in those jurisdictions, therefore, is illuminating." Wood, 187 Conn. App. at 92 n.23. In Mims v. Hoffman, the court found that a doctor who injected the plaintiff without her consent was protected from a battery claim by the emergency exception because "the evidence stablishes that [the doctor] believed the treatment was needed (she observed that [the plaintiff] was suffering from some sort of psychosis and needed to be stabilized so that she

-29-

could be evaluated) and that [the plaintiff] could not consent." No. 11 C 1503, 2013 WL 5423851, at *7 (N.D. Ill. Sept. 27, 2013); see also In re Estate of Allen, 848 N.E.2d 202, 211 (Ill. App. Ct. 2006)("[T]he emergency exception provides a defense to medical-battery claims asserted against medical professionals who render care in emergency situation.")

The plaintiff was treated at St. Vincent's pursuant to the PEER Request. At approximately 8:00 p.m., Officer Doda executed the PEER Request. The plaintiff arrived in an ambulance at St. Vincent's emergency department from the police station with police escort and was admitted.

The PEER Request states that the plaintiff was "disoriented; uncooperative; agitated; obsessive; anxious; exhibiting mood swings, panic attacks, and assaultive thoughts/behavior; not aware of what day it was; and had possibly abused a substance." St. Vincent's Local Rule 56(a)1 Statement ("St. Vincent's L.R. 56(a)1"), Ex. B, ECF No. 275, St. V Records at 000042. The medical records reflect that the plaintiff was "very angry, shouting, upset about having been brought to the hospital. He was confused as to the day of the week and angry when corrected. He seems emotionally labile, at times calm, then quickly shouting again. Speaking to the patient's father by telephone, who is a physician who does not live locally, the patient may have an undiagnosed psychiatric

illness and has seemed particularly 'out of control' over the past 10 days." Id., Ex. B, St. V. Records at 000009. The doctor examined the plaintiff but was "unable to obtain an accurate review of Plaintiff's systems due to Plaintiff's agitation," and he "concluded that it was necessary to evaluate Plaintiff for an organic cause for his altered mental status because his degree of anger and agitation was extraordinary." Id., Ex. B, St. V. Records at 000009-10. To make that evaluation possible, the plaintiff was sedated. Id. ¶ 13; id., Ex. B, St. V. Records at 000010. The plaintiff did not sign an informed consent form prior to being sedated because "Pt in violent state, was sedated." Id., Ex. B, St. V. Records at 0000035.

The plaintiff fails to offer evidence that creates a genuine issue with respect to St. Vincent's reason for deciding to sedate him. The plaintiff merely argues that "The [US Centers for Medicare and Medicaid (CMS)] medical determination and billing statement encapsulated in Plaintiff's Exhibit A (June 2015) established after a thorough review of the medical records of the Plaintiff from his encounter with defendant St. Vincent's on 4-5 April 2015, that there was no basis, emergency or otherwise, that necessitated sedation and therefore refused payment for the sedation drugs." Pl.'s L.R. 56(a)2 for St. Vincent's at 4; id., Ex. A, ECF No. 287-1. The plaintiff contends that this exhibit shows that "a PEER examination

requested by the City of Bridgeport Police was never performed." Pl.'s L.R. 56(a)2 for St. Vincent's at 5-6. This is a mischaracterization of that document, which states on the top of each page that "This is not a bill" and does not contain any medical diagnosis or determination. See id., Ex. A.

The plaintiff also argues that "Defendant Doda filed a falsified Police Emergency Examination Request." Id. at 11. However, as discussed above, this allegation is unsupported and, in any event, it does not create a genuine issue with respect to the fact that St. Vincent's treatment of the plaintiff was pursuant to the PEER Request. Additional arguments by the plaintiff that he was never examined by Dr. Doss, that he was not violent or threatening to anyone, and that the emergency room triage note completed by a nurse at 9:30 p.m. states that the plaintiff was "Alert" and "Appropriate, Calm, and Cooperative," Pl.'s L.R. 56(a)2 for St. Vincent's, Ex. C, ECF No. 287-3, St. V Records at 000002, do not create a genuine issue as to the fact that Dr. Doss was unable to obtain an accurate review of the plaintiff's systems due to the plaintiff's "agitation" at 9:39 p.m. and that Dr. Doss concluded that it was necessary to evaluate the plaintiff for an organic cause for his altered mental status and the plaintiff was given a sedative to make such an evaluation possible. St. Vincent's L.R. 56(a)1, Ex. A, OIAFILE 000044. The part of the medical

record pointed to by the plaintiff is consistent with Dr. Doss's assessment that the plaintiff was emotionally labile, i.e. the plaintiff was at times calm but then he would start shouting again.

Thus there is no genuine issue of material fact as to whether the emergency exception to the informed consent doctrine applies in this case. It does apply.

Therefore, the motion for summary judgment is being granted as to Count Five and Count Six.

## IV.   CONCLUSION

The Municipal Defendants' Motion for Summary Judgment (ECF No. 270) is hereby GRANTED; summary judgment shall enter in their favor on the claims in Count One and Count Three brought pursuant to 42 U.S.C. § 1983, and the court declines to exercise supplemental jurisdiction over the remaining claims against the Municipal Defendants. St. Vincent's Motion for Summary Judgment (ECF No. 276) is hereby GRANTED, as to the only remaining claims against it, Count Five and Count Six.

The Clerk shall enter judgment accordingly and close this case.

It is so ordered.

Dated this 31st day of March 2021, at Hartford, Connecticut.

                                    /s/ AWT
                            ───────────────────────
                             Alvin W. Thompson
                        United States District Judge